# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

DARVIS SANTIESTEBAN,

        Plaintiff,

v.                                         Case No. 5:18-cv-15-Oc-32PRL

MR. MONTALVO and
MR. M. OCASIO,

        Defendants.

_____

## <u>ORDER</u>

### I.    Status

Plaintiff is a federal prisoner proceeding on a Second Amended Complaint (Doc. 32). He sues Mr. Montalvo, an Assistant Health Services Administrator; and M. Ocasio, now-former Warden of Coleman Correctional Complex.[1] Plaintiff alleges that he was injured while playing softball on the recreation yard, and Defendants were deliberately indifferent to his resulting serious medical needs. He seeks monetary damages as relief, and requests that he receive no "repercussions for filing this suit."

_____

[1] The Court previously dismissed the claims against M. Delalamon and all official capacity claims against Defendants Montalvo and Ocasio. <u>See</u> Order (Doc. 37).

Before the Court are the parties' cross-motions for summary judgment and respective responses. <u>See</u> Plaintiff's Motion for Summary Judgment (Doc. 45); Defendants' Opposition to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgment (Doc. 49); Plaintiff's Reply and Response to Defendants' Opposition and Cross-Motion for Summary Judgment (Doc. 52).[2] The Motions are ripe for review.

## II.    Standard of Review

"'Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" <u>Hinkle v. Midland Credit Mgmt., Inc.</u>, 827 F.3d 1295, 1300 (11th Cir. 2016) (quoting <u>Jurich v. Compass Marine, Inc.</u>, 764 F.3d 1302, 1304 (11th Cir. 2014)); <u>see</u> Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Bowen v. Manheim Remarketing, Inc.</u>, 882 F.3d 1358, 1362 (11th Cir. 2018) (quotations and citation omitted); <u>see</u> <u>Hornsby-Culpepper v. Ware</u>, 906 F.3d 1302, 1311 (11th Cir. 2018) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." (quotations and citation omitted)). In considering a summary judgment motion, the Court views "the evidence and all reasonable

---

[2] The Court advised Plaintiff of the provisions of Federal Rule of Civil Procedure 56 and the consequences of granting such a motion. <u>See</u> Order (Doc. 20).

inferences drawn from it in the light most favorable to the nonmoving party." Hornsby-Culpepper, 906 F.3d at 1311 (quotations and citation omitted).

"[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote and citation omitted); see Winborn v. Supreme Beverage Co. Inc., 572 F. App'x 672, 674 (11th Cir. 2014) (per curiam) ("If the movant satisfies the burden of production showing that there is no genuine issue of fact, 'the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor.'" (quoting Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008)). "'A mere scintilla of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party.'" Loren v. Sasser, 309 F.3d 1296, 1302 (11th Cir. 2002) (quoting Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (internal quotations omitted)).

"The principles governing summary judgment do not change when the parties file cross-motions for summary judgment. When faced with cross-motions, the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts." T-Mobile S. LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008).

### III.    Plaintiff's Second Amended Complaint[3]

Plaintiff was playing softball on the recreation yard at Coleman Federal Correctional Complex on August 30, 2015, when he fell and injured his right knee and left upper arm. He was sent to the health clinic and seen by F. Dudas, EMT. His injury was initially diagnosed as an upper arm contusion by Delalamon. After multiple sick-call visits, "the correct diagnos[is] was uncovered by another physician['s] assistant." Plaintiff claims that his "injury initially required adequate medicine and a simple surgery." He states that on November 30, 2015, an "[o]rthopedic doctor informed [him] . . . that[] due to the length of time that had passed since the injury, his injury had escalated from 'normal' to 'chronic,' and he would now need two surgeries to repair his injury resulting with handicap, pain and discomfort." On December 7, 2015, "[P]laintiff was approved for the surgeries," but "the surgeries were not done until February 27, 2017. Due to the delay, [ P]laintiff had to endure excruciating pain and discomfort." Plaintiff claims that "[Defendant] Montalvo and [Defendant] Ocasio both played a part in the deficient medical treatment [P]laintiff received by failing to arrange and administrate surgery for [ P]laintiff in a timely manner."

---

[3] The Court primarily focuses on the allegations against Defendants Ocasio and Montalvo.

Plaintiff claims that Defendants Montalvo and Ocasio "failed to take reasonable measures to send [ P]laintiff to get the surgeries he needed after they were approved . . . causing [ P]laintiff to endure prolong[ed] excruciating pain and discomfort, which was also substantially harmful to [ P]laintiff's health." He also "continues to experie[nc]e residual weakness in the strength of his tricep[] tendon, numbness and lack of mobility as well." Plaintiff alleges that Defendants Montalvo and Ocasio "both sat on the committee that approves and determine[s] 'when' and 'where' such treatments . . . are performed," and that "[t]hey were both made aware of the circumstances of the case in order to approve the procedure[.]" He states that he "shared the complaint regarding the medical treatment he was receiving with both[ Defendant] Montalvo and [Defendant] Ocasio separately numerous times, and each time they would spin[4] [P]laintiff."

## IV.    Parties' Summary Judgment Positions

Plaintiff reiterates his factual allegations and argues that the record shows he needed surgery, but he did not timely receive the surgery and thus suffered severe pain for 417 days. See Doc. 45 at 1-3. During that time, he asserts that he "communicated to Defendants Montalvo and Ocasio about his severe pain and the delay in receiving his surgery," but they failed to take any

---

4 Plaintiff defines "spin" as: "avo[i]ding issue, misdirecting, fail to address, or fail to deal with."

action. Id. at 5. In support of his contention that he communicated his situation to Defendants, he cites to two emails he sent. Id. at 6 (citing id. at 29-30). The first email is dated January 3, 2016, and it was sent to "Health Services LOW." Id. at 29. Plaintiff addressed the email to Defendant Montalvo and stated:

> I went to sick call because the medication I was taking was not doing me any good because I was still in pain because of my ruptured triceps. Medical staff changed my medication from Naproxen to Meloxicam 15 mg one a day and these medication is also not working for the extreme pain I have in my arm. Please help me with these issue[.] Sir I cant take these pain anymore. I have been dealing with these issue seen [sic] my accident acured [sic] in August 2015. Please help me. Thank you.

Id. The second email, dated April 29, 2016,[5] was sent to the Warden and states:

> Sir I have a big issue and I don't know who to go to anymore. I have gone to everybody and nobody can help me or nobody want to give me answers. I had an accident here on the softball field August 30 2015. I fell and after the MRI we realized I had ruptured my tricep. Ok after time had passed by I had to file a BP-8, 9, 10 and 11 because I was not being taken care of[] and the situation worsened because of the time that has passed by and the lack of medical attention. I now am designated to a different institution for my operation. Well I have been designated for 2 months now and I am still here. I went today to medical to find answers in why I am still here and not transferred yet. I was told [b]y the medical staff today that a hold was put on me and it was by mistake but these mistake has delayed the time for my operation. Please sir I need for

---

[5] Plaintiff states in the Motion that he sent the email on May 9, 2016. Doc. 45 at 3. However, the exhibit shows that Plaintiff sent the email on April 29, 2016, and he received the response on May 9, 2016.

> you to take action on these situation because this is
> to[o] much. If I hadn't gone today to sick call 4-29-2016
> I would have never none [sic] why I am not being
> transfer[r]ed and taken care of[]. The medical staff
> told me that the person who takes care of my issue is
> not here exc. On my BP-10 I was told by Regions that
> if the issue wasn't taken care of[], to appeal to you the
> Warden of the institution. But before I take those
> measures I write to you to see if you can resolve the
> problem. Thank you for your time.

Id. at 30 (some internal formatting modified). As a result, Plaintiff asserts that he now has "permanent loss of range of motion and quality of life[] and recurring pain." Id. at 5. Plaintiff requests summary judgment in his favor and an award of $300,000 along with costs in the amount of $500. Id. at 7.

Defendants counter Plaintiff's assertions, arguing that "the comprehensive medical records, the submitted pleadings, and supporting affidavits clearly establish that neither Defendant is a medical professional and neither Defendant was directly involved in Plaintiff's medical care." Doc. 49 at 10.[6] Defendants further assert that their duties were unrelated to medical care

---

[6] Defendants also argue that they are entitled to judgment as a matter of law because Plaintiff asserts claims against them in their official capacities only. Doc. 49 at 14-15. Defendants' request in this regard is denied as moot, because the Court already dismissed those claims. See Order (Doc. 37). Although Plaintiff only checked "official capacity" on the complaint form, considering his pro se status and his allegations, it is clear he intended to sue Defendants in their individual capacities. See Doc. 52 at 5, 11-12; see also Young Apartments, Inc. v. Town of Jupiter, FL, 529 F.3d 1027, 1047 (11th Cir. 2008) (explaining that "[w]hen it is not clear in which capacity the defendants are sued, the course of proceedings typically indicates the nature of the liability sought to be imposed," and in considering the "course of proceedings," courts look to the

and treatment of inmates. Id. at 11. Defendant Ocasio avers that he did not participate in or have any authority over the Utilization Review Committee; Defendant Montalvo avers that he "does not recall being involved in any Utilization Review Committee decisions regarding Plaintiff's care, but the final authority of the committee rests with the Clinical Director and Defendant Montalvo could not have overruled any such decision." Id. at 11-12. In support, each Defendant submitted a declaration. They also submitted a declaration by Hector Lopez, M.D., and a declaration by Captain Damien Avery, DPT, OCS, both of which include medical records from before and after Plaintiff's surgery.

In his Declaration, Defendant Ocasio states that, as the Warden of Coleman FCC, his "responsibilities included administrative and organization control of the institution." Doc. 49-1 at 2. He avers that his "job consisted of supervisory and managerial related responsibilities of personnel in order to maintain the safety and security of the institution, staff, and the inmates," but he did "not have any input or decision making power when it c[a]me[] to patient care and other medical decisions." Id. Rather, such decisions were "left to the Clinical Director and other medical personnel." Id. He further asserts that he did "not participate in the Utilization Review Committee," and the Clinical

_____

nature of plaintiff's claims, requests for compensatory or punitive damages, and the nature of any defenses raised in response to the complaint, particularly claims of qualified immunity which serve as an indicator that the defendant had actual knowledge of the potential for individual liability").

Director has "final authority for all URC decisions," which Defendant Ocasio could not overrule. Id. Defendant Ocasio avers that "[w]hen and how the Inmate receives the care from outside consults that have been approved[] is also handled by the medical professionals" and that he did "not participate in the medical care of an inmate." Id. at 3. He asserts that if he were contacted by an inmate or their families regarding the inmate's medical care, he would "inform them that [he is] not a medical professional, and that they should address this concern with the medical personnel or their primary care physician as soon as possible." Id. He additionally would "forward their requests to the appropriate medical staff, but [he could not] control how an inmate is triaged, or how and what type of medical treatment they receive, as [he is] not a medical professional." Id. He states that he "do[es] not recall speaking with [Plaintiff] in person about his medical treatment," but even if he did, he "would have referred him to the appropriate medical staff." Id. Finally, Defendant Ocasio affirms that the response to Plaintiff's administrative remedy, in which Plaintiff advised that he was experiencing pain and raised a concern about a delay in receiving surgery, was not signed by him but by another warden in his absence. Id. (referring to Doc. 49-1 at 5).

According to Defendant Montalvo, he served "as an Assistant Health Services Administrator (AHSA) at FCC Coleman, Low from approximately June 2012 to October 31, 2017," and was responsible for "overseeing the day-to-

day operations of the Health Services Department, which involved managing and directing the activities of a multi-disciplinary team of health care professionals responsible for medical, dental, and allied health services to the inmate population, in collaboration with the Assistant Health Administrator and the Clinical Director." Doc. 49-2 at 2. He asserts that his "responsibilities were primarily administrative in nature" and he "did not participate in inmate medical care" or "have input as to the type and timing of treatment inmates received." Id. "These decision[s] are the sole responsibility of the medical providers, to include Nurses, Emergency Medical Technicians (EMT), Mid-Level Practitioners (MLP), and Physicians. Each of these medical personnel were directly supervised by the Clinical Director." Id. If an inmate asked him "about their non-emergency medical care, [his] custom and practice was to explain to them that [he is] not a medical provider and that they should follow up during sick call or with their primary care physician as soon as possible." Id. He states that "[t]he URC is chaired by the Clinical Director, and the Clinical Director is the final authority for all URC decisions," which "cannot be overturned by the Warden, Associate Warden, HSA, AHSA, or primary care physician." Id. at 3. Defendant Montalvo "do[es] not recall being involved in a URC decision regarding the medical treatment of [Plaintiff]," but regardless, he "would not have any power to make a clinical decision as to [Plaintiff's] medical

care and/or actual treatment." Id. As to Plaintiff's January 3, 2016, email addressed to Defendant Montalvo, he states:

> I have reviewed the January 3, 2016, email Inmate Santiesteban attached to his Motion for Summary Judgment as Exhibit 14. It appears he sent this email to the general inmate to staff Health Service email box and addressed this to Health Services LOW as a Request to Staff. He added my name to the body of the email expressing concern about a change of his pain medication. At that time inmates did not have direct access to individual staff members via email. I did not manage this general email account. My recollection is that emails sent to this address were checked by administrative staff, who would forward the emails to health services or the individual for possible resolution.
>
> I do not remember receiving the January 3, 2016 email. In the email he is seeking a change in medication. In instances such as this, I would refer the inmate to his primary care physician, as well as referring them to sick call so that they could speak with a health care provider. I did this in these instances because I did not provide or participate in medical care or medical decisions, and the prescribing of medication is a health care decision. Reviewing his medical records, he saw a medical provider several times after this email. There were many opportunities for him to have requested a change in medication from qualified personnel.

Id. Finally, Defendant Montalvo avers that he "was not personally involved in the medical care of [Plaintiff]," nor did he "direct medical staff regarding [Plaintiff's] medical treatment." Id.

11

Dr. Lopez, who served as the Clinical Director at FCC Coleman from 2014 to 2016 submitted the following Declaration:

1. I am currently employed by the Federal Bureau of Prisons as the Southeast Regional Physician and have been since August 2016. My duties and responsibilities include providing medical care to inmates at institutions in the Southeast Region that may need additional medical assistance. In addition, I frequently review the treatment provided by other medical staff within the region and also in some cases review requests for certain procedures to be performed. From 2014 to 2016, I served as Clinical Director at the Coleman Federal Correctional Complex (FCC Coleman). I have been employed by the Federal Bureau of Prisons for approximately 14 years.

2. As part of my duties, I provide medical care to the inmate population at various institutions within the Southeast Region. I have access to documents and electronic data created and/or maintained by the Federal Bureau of Prisons ("Bureau" or "BOP"). These records are made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of the relevant matters.

3. I have reviewed the Complaint filed by Inmate Darvis Santiesteban, Register Number 34129-379, as well as his medical records. The medical records indicate that since he transferred to FCC Coleman, the inmate was seen by on-site medical staff for evaluation of a pre-existing pain in his elbows as well as a torn left triceps.

4. In addition to the treatment of symptoms and pain management, Inmate Santiesteban's left elbow was imaged on multiple occasions, to include an x-ray on September 4, 2015, revealing no acute injury,

and another on September 25, 2015 following a fall on his left elbow that day. The Utilization Review Committee (URC) approved an MRI, which occurred on approximately October 10, 2015, that revealed a rupture of the distal triceps.

5. In September 2015, the URC approved a request for an orthopedic consult. After examining Inmate Santiesteban on November 30, 2015, the consulting specialist declined to perform the recommended surgery as outside her area of expertise and suggested the inmate see a shoulder/elbow sub-specialist. In December 2015, the URC referred the request for Inmate Santiesteban's consult with a sub-specialist to Region Review. When the requested consult had not been approved, I referred Plaintiff to a BOP orthopedic surgeon and physical therapist for consult in February 2016. In May 2016, a second specialist declined to perform the recommended surgery as outside her scope of expertise.

6. During this time, medical staff submitted requests to have Inmate Santiesteban transferred to Federal Medical Center Butner (FMC Butner) to address his medical needs. The transfer was approved on March 2, 2016. Inmate Santiesteban's surgical classification was designated as a routine-urgent, meaning inmates with more serious concerns would be given bed space before him.

7. On June 10, 2016, a clinical note indicates bed space is available at FMC Butner, and the inmate transfer was approved.

8. Inmate Santiesteban's medical records reveal that his triceps injury was properly evaluated and he received medically appropriate care. The records also indicate Inmate Santiesteban received diagnostic imaging when necessary and his injury was appropriately diagnosed. As well, he was

appropriately sent to two outside specialists for evaluation; although, as previously stated, the specialists were unable to perform the surgery.

9. In addition to the medical treatment he received, Inmate Santiesteban's subjective complaints of pain were appropriately managed. He was primarily given Naproxen for his pain management, but when he let staff know the Naproxen was not effective, he was provided a different medication to alleviate his pain.

10. Although the surgery did not occur as quickly as Inmate Santiesteban wanted, a successful surgical intervention was performed. There is no documented medical evidence indicating that medical staff ignored his medical needs or that they intentionally or unnecessarily delayed his surgery. The medical records indicate that Inmate Santiesteban made a full recovery following surgery to repair his left triceps and follow-up physical therapy.

11. The URC is chaired by the Clinical Director and all final medical decisions are approved by the Clinical Director. In this instance, the URC approved Inmate Santiesteban's visits to the outside specialists and requested his transfer to FMC Butner. Each of these actions were done in accordance with approved policies and procedures.

Doc. 49-3 at 1-3.

The final Declaration submitted by Defendants is the Declaration of Captain Damien Avery, DPT, OCS. He avers as follows:

1. I am currently employed by the United States Government, Federal Bureau of Prisons, as a Physical Therapist Orthopedic Specialist at the Federal Medical Center (FMC) Butner, in Butner,

North Carolina. As a Physical Therapist Orthopedic Specialist, my responsibilities include assisting the orthopedic surgeon in managing case load, providing patient care, and acting as liaison between rehabilitation & orthopedics. I have been employed by BOP since 1998 as a physical therapist, with the exception of 2003-2005, when I attended seminary school. I worked at FMC Carswell, Texas from 1998-2003, FMC Butner for almost the remainder of my current employment with BOP; from March 2007 to September 2008, I left FMC Butner briefly to open a physical therapy clinic at the Federal Correctional Center- Tucson.

2. I have a master's and a doctorate from the US Army-Baylor University Program for Physical Therapy, awarded in 1998 & 2007 respectively. I am board certified in orthopedic physical therapy since 2002.

3. As part of my duties, I have access to documents and electronic data created and/or maintained by the Federal Bureau of Prisons. These records are made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of the relevant matters.

4. Inmate Darvis Santiesteban, Registration Number 34129-379, arrived at FMC Butner on August 2, 2016. As part of the orthopedic medical team, I personally participated in Inmate Santiesteban's medical care and am familiar with the treatment provided. I saw him on a regular basis prior to the February 27, 2017 surgery of his left triceps and followed him after the surgery to ensure he followed medical recommendations and was progressing in his recovery. I have also re-reviewed Inmate Santiesteban's medical records with specific regard to the medical treatment provided with respect to his left triceps at Butner FMC.

15

5. The medical staff monitored Inmate Santiesteban's condition from the time of his arrival until the date of his scheduled surgery. He was provided pain medication when requested and medically necessary.

6. FMC initially scheduled his left triceps surgery for December 5, 2016. [Plaintiff] initially presented with a complex picture not entirely consistent with a simple tricep tendon rupture. Consequently, repeat plain films, MRI, nerve conduction studies, and a second opinion from a Hand Surgeon were necessary before surgical scheduling could be completed. The surgery then had to be postponed when the Inmate was placed in the Special Housing Unit after he was involved in an altercation with another inmate on November 30, 2016.

7. His surgery was rescheduled for February 27, 2017, and performed with no complications.

8. Inmate Santiesteban's post operation care consisted of regular follow-up appointments with the orthopedic team (one physician, two physician assistants & one physical therapist), and physical/occupational therapy appointments in order to improve the overall functionality and strength of the left arm.

9. Medical records indicate Inmate Santiesteban received timely and appropriate medical care to include pain medication for pain management. His records indicate that he was a participant in these medical decisions as he specifically requested to discontinue narcotics for pain management, and instead was provided Tylenol to manage his pain.

10. His cast was removed on April 14, 2017, and his physical/occupational therapy appointments were scheduled.

11. His recovery plan consisted of the initial casting, then splinting of his surgically repaired arm. Once the cast was removed he started his physical therapy program. This program consisted of progressive range of motion exercises (passive, active and active assisted), strengthening exercises (isometric and isotonic resistive), and stretching with heat.

12. Inmate Santiesteban's medical records reveal that on May 26, 2017, during an orthopedic follow-up, he reported to the orthopedic surgeon that he was not feeling any pain and he was not experiencing any problems.

13. Medical records indicate that approximately a month later on June 30, 2017, he informed clinical staff that he did not have any functional limitations and demonstrated for staff that he had strength in his arm by doing body weight exercises with no pain. He asked staff if he could have stronger therabands to continue to strengthen his arm.

14. Inmate Santiesteban successfully completed his physical therapy for []his left triceps. He was able to achieve, what can be best described as, a full recovery. He has attained full function of his arm with no deficits in his range of motion, no pain, no lack of functionality; and no deficits in strength.

15. Any delay alleged in Inmate Santiesteban's surgery on his left triceps did not have an effect on the result of the surgery and did not impair the successful recovery of functionality and strength in Inmate Santiesteban's arm. Additionally, Inmate Santiesteban has stated he was so pleased with the surgery and recovery that he requested to have surgery of his right elbow and right knee.

Doc. 49-4 at 2-4.

In Plaintiff's response, he asserts that he "communicated with both Defendants Ocasio and Montalvo by email and in person, during mainline." Doc. 52 at 2. He claims that "[a]ll electronic messages sent to Health Services go to the AHSA," which at the relevant time was Defendant Montalvo. Id. He further states he "communicated with Defendant Ocasio on several occasions, by email or in person, regarding his medically necessi[t]ated transfer and his severe pain." Id. He additionally asserts that "[t]he delay in receiving medically necessi[t]ated surgery and the severe pain Plaintiff suffered caused him to suffer severe depression and was seen by Psychology Services." Id. at 3. He argues that because he brought his concerns regarding the lack of adequate medical treatment to Defendants' attention, they were under a "duty to investigate and/or ensure Plaintiff was receiving mandated adequate medical care." Id. at 9; see id. at 10-11.

Moreover, Plaintiff attacks the authenticity and accuracy of some of the documents submitted in support of Defendants' position, and he claims that Defendants may have violated his right to privacy by filing medical records that are not relevant to the issues in this case. See Doc. 52 at 3, 4, 5-8.[7] Plaintiff

---

[7] One document Plaintiff takes issue with is a Utilization Consult Review Case Review Decision dated December 7, 2015. One copy shows that his request for an elbow and shoulder surgeon was approved (Doc. 52 at 25) while another copy has a handwritten note saying "error" and "referred to Region. New letter resent" (id. at 26). It appears that the first copy was sent in error, and the second

18

requests entry of summary judgment in his favor, but also "renew[s] his request for appointment of counsel." Id. at 13.[8]

## V.    Analysis

"To prevail on [a] § 1983 claim for inadequate medical treatment, [the plaintiff] must show (1) a serious medical need; (2) the health care providers' deliberate indifference to that need; and (3) causation between the health care providers' indifference and [the plaintiff's] injury." Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla., 871 F.3d 1272, 1279 (11th Cir. 2017) (citation omitted).

> A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition. In either case, the medical need must be one that, if left unattended, poses a substantial risk of serious harm.

Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1307 (11th Cir. 2009) (quotations and citation omitted).

---

copy marked "error" was resent to Plaintiff. Regardless, this does not make a distinction in the Court's analysis.

[8] Plaintiff's request for counsel is denied. See Order (Doc. 53) (denying Plaintiff's request for counsel for the same reasons previously stated in Docs. 22, 47).

Deliberate indifference to a serious medical need requires "three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003) (citations omitted); see Patel v. Lanier Cty. Georgia, No. 19-11253, 2020 WL 4591270, at *9 n.10 (11th Cir. Aug. 11, 2020) (recognizing "a tension within [Eleventh Circuit] precedent regarding the minimum standard for culpability under the deliberate-indifference standard," as some cases have used "more than gross negligence" while others have used "more than mere negligence"; finding, however, that it may be "a distinction without a difference" because "no matter how serious the negligence, conduct that can't fairly be characterized as reckless won't meet the Supreme Court's standard" (citations omitted)). "Subjective knowledge of the risk requires that the defendant be 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Dang, 871 F.3d at 1280 (quoting Caldwell v. Warden, FCI Talladega, 784 F.3d 1090, 1099-1100 (11th Cir. 2014)).

> An official disregards a serious risk by more than mere negligence "when he [or she] knows that an inmate is in serious need of medical care, but he [or she] fails or refuses to obtain medical treatment for the inmate." Lancaster v. Monroe Cty., Ala., 116 F.3d 1419, 1425 (11th Cir. 1997), overruled on other grounds by LeFrere v. Quezada, 588 F.3d 1317, 1318 (11th Cir. 2009). Even when medical care is ultimately provided, a prison official may nonetheless act with deliberate

indifference by delaying the treatment of serious medical needs. See Harris v. Coweta Cty., 21 F.3d 388, 393-94 (11th Cir. 1994) (citing Brown v. Hughes, 894 F.2d 1533, 1537-39 (11th Cir. 1990)).[9] Further, "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." Mandel v. Doe, 888 F.2d 783, 789 (11th Cir. 1989) (citations omitted). However, medical treatment violates the Constitution only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986) (citation omitted).

Dang, 871 F.3d at 1280. "'[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. Each individual defendant must be judged separately and on the basis of what that person kn[ew].'" Id. (quoting Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008)).

Upon review of the parties' filings and consideration of the evidence submitted, the Court finds that, viewing the evidence in the light most favorable to Plaintiff, Defendants are entitled to entry of summary judgment in their

---

[9] "Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) (citation omitted). However, "[i]t is also true that when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989) (citing Hamm v. DeKalb Cty., 774 F.2d 1567, 1575 (11th Cir. 1985)); see Boone v. Gaxiola, 665 F. App'x 772, 774 (11th Cir. 2016).

favor. It is undisputed that Defendants are not medical professionals and were not involved in Plaintiff's medical care or treatment. Even if Plaintiff advised these Defendants about his issues, they did not have the authority to provide or govern the type of treatment he received and would have directed him to medical and/or forwarded his complaints to medical personnel. Indeed, Plaintiff received the following response to his April 29, 2016, email addressed to the Warden: "See the Medical Representative at mainline." Doc. 45 at 30. There is no evidence suggesting that Defendants were deliberately indifferent.

Moreover, the medical records from Coleman FCC show that Plaintiff was seen by several health care providers for his injury, his elbow was imaged on multiple occasions, and he saw two outside specialists for consultations. Less than two months after Plaintiff sent his April 29, 2016, email to the Warden, his transfer to Butner FMC was approved.[10] When a bed became available, Plaintiff was transferred to Butner on about July 21, 2016. See Doc. 49-3 at 167.[11] His surgery was initially scheduled for December 2016, but Plaintiff got into an altercation with another inmate and was moved to the Special Housing

---

[10] Dr. Lopez provides two different dates in his declaration for when Plaintiff's transfer was approved. He first states that it was approved on March 2, 2016, and subsequently avers that bed space was available and Plaintiff's transfer was approved on June 10, 2016.

[11] Plaintiff was seen at Butner for his "14-day physician evaluation after recent arrival" from Coleman on August 5, 2016. See Doc. 49-4 at 38.

Unit; thus, his surgery was postponed. <u>See</u> Doc. 49-4 at 7. Although Plaintiff did not receive the surgery as timely as perhaps he should have, there is no evidence to suggest that Defendants either personally or through a policy denied or delayed any medical treatment to Plaintiff. Neither has Plaintiff presented any "verifying medical evidence" showing that he suffered any "detrimental effect" as result of the alleged delay. <u>See</u> <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1188 (11th Cir. 1994), <u>overruled on other grounds by Hope v. Pelzer</u>, 536 U.S. 730 (2002) ("An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed."). And Defendants cannot be found liable simply because they hold supervisory positions. Accordingly, it is

**ORDERED:**

1.   Plaintiff's Motion for Summary Judgment (Doc. 45) is **DENIED**.

2.   Defendants' Cross-Motion for Summary Judgment (Doc. 49) is **GRANTED**.

3.   The Clerk shall enter judgment in favor of Defendants Montalvo and Ocasio and against Plaintiff, terminate any pending motions, and close the file.

4.      As to Plaintiff's concerns about his medical records, should he seek to have any of the records filed under seal, he may file a motion in accordance with this Court's Local Rule 1.09.

**DONE AND ORDERED** in Jacksonville, Florida, this 1st day of September, 2020.


TIMOTHY J. CORRIGAN
United States District Judge


JAX-3 8/31
c:
Darvis Santiesteban
Counsel of record